Filed 4/10/13  P. v. White CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060969 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD228290) |
| BILLY CHARLES WHITE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Frank A. Brown, Judge.  Affirmed as modified.


A jury found Billy Charles White guilty of rape of an intoxicated person (Pen. Code,[1] § 261, subd. (a)(3); count 1) and of rape of an unconscious person (*id.*, subd. (a)(4)(A); count 2).  The trial court sentenced White to three years in state prison and ordered him to register as a sex offender.

---

1      All statutory references are to the Penal Code.

White contends the evidence is insufficient to prove under section 261 that when he engaged in sexual intercourse with the victim, he knew the victim was unable to resist because of intoxication (count 1) or because the victim was unconscious of the nature of the act of intercourse (count 2). White also contends the trial court prejudicially erred by refusing both to instruct the jury on mistake of fact and to grant his new trial motion based on juror misconduct. Finally, White contends the trial court abused its discretion when it denied him probation.

In addition to these contentions, on our own motion we requested supplemental briefing from the parties whether White's convictions on counts 1 and 2 should be consolidated under *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*) and its progeny into a single conviction given there was a single act of sexual intercourse.

As we explain, we reject White's contentions on appeal. After considering the supplemental briefing of the parties, we conclude that White was not properly convicted both on counts 1 and 2 and further, that the judgment must be modified to reflect only one conviction for violation of section 261.

FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2010, White asked the victim to go out for Valentine's Day. White knew the victim from a local bar White frequented, where the victim worked as a bartender. White and the victim in the past had participated in some group activities, including taking a trip to Las Vegas with other employees and patrons of the bar. Although the victim refused to go out alone with White on Valentine's Day, she agreed to go out in a group that included White.

2

That night, the victim met White at the local bar where the victim worked. Before she met up with White, the victim had dinner with a friend. During dinner the victim consumed one beer.

At about 9:00 p.m., the victim drove to downtown San Diego with White and John Jacoby (John), another regular from the bar where victim worked. The victim dropped off White at a hotel where White planned to stay. However, the victim had not intended to stay the night at the hotel. After the victim parked her car in the hotel parking lot, they headed downtown to some clubs but found the lines to enter too long and the cover charge for admission too expensive. The victim next contacted a friend who worked at a "gentlemen's club" (club).

The three of them went to the club at about 10:30 p.m., sat in the "V.I.P." section and purchased a bottle of vodka to share. While at the club, the group was joined by John's brother, Joey Jacoby (Joey), Joey's girlfriend, Jamey Booth (Jamey), and victim's former boyfriend. White and John each received a private or "lap" dance at the club.

With the exception of the victim's former boyfriend, the group stayed at the club until it closed at about 2:00 a.m. The victim testified she consumed at least four vodka drinks while at the club. The victim also testified she did not remember leaving the club; instead, her last memory that night was being told by club employees that the club was closing. Her next memory was waking up at 5:30 a.m. in the hotel room after "somebody roll[ed] off of [her]."

The victim testified that on the night of the attack, she dreamt she was being touched and kissed. The victim also testified that when she awakened she looked at the

3

clock and realized then she was in a hotel room and that somebody actually had been touching her, including her vagina and breasts. At that moment, the victim knew somebody had intercourse with her while she had been in a "dream state." The victim testified she remember saying "no" to intercourse, but could not remember whether she was actually saying "no" out loud to her attacker or was saying it "inside [her] head."

The victim testified she saw John sleeping on a bed to her left. The victim still had on her dress and sweater but her dress was "scrunched up" like a shirt, her underwear was missing and her bottom half was exposed. The victim saw White in bed next to her, wearing an undershirt with his pants down. White appeared to be sleeping.

The victim got up from the bed, found her underwear and frantically went over to John. The victim shook John to wake him. The victim next grabbed a few of her belongings and ran out of the room into the hallway, where she sat crying.

John came to the victim's assistance. The victim told John she had been raped. Because of the noise, hotel security approached the victim and John in the hallway and told them either to leave the hotel or go back inside their room. The victim did not tell security she had been raped because she was embarrassed. John drove the victim home.

The victim testified that once home she felt "completely lost" emotionally. She could not remember going to the hotel the night before or how she ended up sleeping in the hotel room. The day after the attack, the victim told her roommate what had happened, who called police. The victim was taken to a clinic for an evidentiary examination.

4

The examination revealed abrasions on the peri-hymenal area of the victim, both left and right, and lacerations on the victim's posterior fourchette and the fossa navcularis. The findings were consistent with the victim being asleep or unconscious and not physically aroused at the time of sexual penetration.

The victim's roommate testified she could hear the victim crying inside her room most of the day following the attack, and the victim appeared scared and shaken up. The victim's roommate also testified that more than a day after the attack, the victim was still crying and was wearing the same clothes she had worn on the night of the assault.

Jamey testified on the night of the attack the victim appeared intoxicated as she was having trouble walking. The victim's former boyfriend testified before he left the club that night he offered to take the victim home because in his opinion she was "totally wasted."

As the club closed, White and the victim left in a cab and returned to the hotel. Joey and Jamey were outside the club talking when they saw White and the victim leave. Joey and Jamey were surprised the victim and White left in a cab because they believed Jamey was going to drive them all back to the hotel. Joey and Jamey waited outside the club for John and they too went back to the hotel.

Security camera footage from the hotel showed White helping the victim out of the cab and holding her up as they walked in and around the hotel after returning from the club. In addition, the footage shows the victim at one point veering off and stumbling away from White after she dropped her purse on the floor.

5

Once at the hotel, Joey, John and Jamey by happenstance met up with White and the victim. Joey observed the victim "stumbling around" and saw her walk into the men's restroom. John similarly testified the victim needed assistance walking. John had been with the victim in the past when they had drunk alcohol and he testified he had never seen her as intoxicated as she was that night.

The entire group next went to White's hotel room. Jamey helped the victim into the room and put the victim on one of the two beds. White and John left to find more alcoholic beverages. Joey, Jamey and the victim remained in the room. Joey testified that one minute the victim appeared "kind of fine" and the next minute she was "kind of like passing out." As they talked, Joey saw the victim laying on the floor of the hotel room, in between the two beds, "kind of out of it." Joey and Jamey helped the victim back on the bed, and although the victim tried to sleep, Joey testified the victim kept using the bathroom ostensibly to vomit.

At about that time, John and White returned without any alcohol. They then decided to get something to eat. Because the victim was intoxicated, the group decided she should stay behind and "sleep it off." Joey then drove to a restaurant where he and Jamey dropped off John and White. Joey and Jamey then drove home to Joey's house.

John testified that he and White went back to the club after they finished eating in an attempt to retrieve White's cell phone, which White had left at the club. John and White returned to the hotel at about 3:40 a.m. The victim was sleeping on one of the two beds. While John was using the bathroom, White climbed on the bed where the victim was sleeping. John turned out the light and went to sleep in the other bed.

6

John testified he was awakened by the victim. She appeared "very scared" and was crying. Outside the room in the hallway, the victim told John that White had sexually assaulted her. John went back in the room to obtain the victim's purse and her other belongings. John saw White under the covers in the bed where the victim had been sleeping. John told White that the victim said White had sexually assaulted her. In response, White told John that the victim "had been begging [White] for it."

Photos from the hotel security camera showed the victim and John leaving the hotel. John testified that at times he had to carry the victim as they walked to her car because she was distraught.

## DISCUSSION

### A. *Sufficiency of the Evidence in Counts 1 and 2*

White does not contest that he engaged in sexual intercourse with the victim. He also does not contest the victim had been "partying and drinking" on the night of the alleged assault and was "drunk" when the group reached the hotel at about 2:30 a.m.

However, White contends there is insufficient evidence he knew or should have known that the victim was prevented from or unable to resist the act of intercourse due to either intoxicating substances (§ 261, subd. (a)(3)) or unconsciousness (*id.*, subd. (a)(4)(A)) because there allegedly is no evidence of the victim's condition at about 5:30 a.m. that morning when sexual intercourse occurred, including evidence of whether she was awake or sufficiently conscious at the time such that White would know or reasonably know she was unable to resist.

7

## 1.  Applicable Law

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence.  (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)  Reversal on this ground is unwarranted unless " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*Bolin, supra,* at p. 331; see also *People v. Mendez* (2010) 188 Cal.App.4th 47, 56.)  This standard of review is the same in cases involving circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

The jury here was properly instructed regarding the knowledge element to support a conviction under counts 1 and 2.  Specifically, with regard to count 1, rape of an intoxicated person, the People were required to prove that, among other elements, the defendant "knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting."  (CALCRIM No. 1002, as modified.)  The jury was also instructed that a "person is prevented from resisting if he or she is so incapacitated that he or she cannot give legal consent.  In order to give legal consent, a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character and

8

probable consequences. Legal consent is consent that's given freely and voluntarily by someone who knows the nature of the act involved." (CALCRIM 1002.)

Finally, the jury was instructed regarding a defendant's actual and reasonable belief that a woman was capable of consenting to sexual intercourse, as a defense to the crime of rape: "The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. If the People have not met this burden, then you must find the defendant not guilty." (CALCRIM 1002.)

### 2. Analysis

Substantial evidence in the record supports the jury's finding that White knew or reasonably should have known that the victim was incapable of resisting due to intoxication. Indeed, the record shows that the victim consumed at least four alcoholic beverages between 10:30 p.m. and 2:00 a.m.; that the victim's last memory on the night of the attack was club employees telling her it was time to leave; that multiple witnesses testified the victim was having trouble walking on her own; that the victim's former boyfriend testified the victim was "totally wasted" at the club; that security camera footage from the hotel confirmed the victim was having trouble walking and was walking with the assistance of White; that the victim inexplicably dropped her purse while stumbling around inside the hotel; that once inside the hotel room, the victim "pass[ed] out"; that at some later point inside the hotel room, the victim fell off the bed and slept on

9

the floor between the two beds; that the victim needed assistance getting back onto one of the beds; that the group, including White, agreed the victim should stay in the hotel room to "sleep it off" while the rest of the group left for the restaurant; that the victim did not awaken until about 5:30 a.m.; that when the victim awakened, she did not recall how she got to the hotel or to the room; and that the victim *then* realized that she was not wearing any underwear, although she still had her dress on, that somebody had been touching and kissing her while she was in a "dream state" and that somebody had penetrated her vagina.

We conclude this evidence -- and the inferences that can be drawn from it (see *People v. Wader* (1993) 5 Cal.4th 610, 640) -- amply supports the finding of the jury that White knew or should have known the victim was incapable of resisting intercourse due to alcohol intoxication. But there is more.

The record also shows that when the victim awakened at about 5:30 a.m., White *pretended* to be asleep as he lay next to the victim with his pants down. This evidence, along with the evidence from the clinical examination that showed abrasions on the victim's peri-hymenal area and lacerations on her posterior fourchette and fossa navcularis that were consistent with penetration without sexual arousal, further supports the jury's finding that the victim did not consent to, and was incapable of resisting, sexual intercourse with White.

That much of this same evidence could also support one or more different findings, including that the victim allegedly consented to sexual intercourse with White while she was in a "dream state," as White contended, does not as a matter of law change

10

our conclusion in this case. White made this contention, and aggressively argued it, at trial. As the fact finder, the jury was entitled to accept White's version of events; however by the same logic, the jury also was entitled to reject it, as clearly turned out to be the case here. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact]; see also *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' "].)

As a court of review, we are not at liberty to make findings different from those made by the jury if, as in the instant case, those findings are supported by substantial evidence. (See *People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206 [if the verdict or a finding is supported by substantial evidence, we must accord due deference to the trier of fact].) Moreover, White does not contend any of the witnesses' testimony was physically impossible or inherently improbable. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 725 [a court of review must accept the testimony believed by the jury unless it was physically impossible or inherently improbable, meaning "that the challenged evidence is 'unbelievable per se' . . . . [Citation.]"].)

For similar reasons, we also reject White's contention that there is a lack of evidence to support the finding that White knew or should have known that the victim was unable to resist sexual intercourse with him because she was unconscious. We

11

conclude there is substantial evidence in the record, as summarized *ante*, also supporting this finding.

### B. Consolidation of Convictions Counts 1 and 2

As noted *ante*, White was convicted in count 1 of rape of an intoxicated person (§ 261, subd. (a)(3)) and in count 2 of rape of an unconscious person (*id.*, subd. (a)(4)(A)). There is no dispute that both convictions under section 261 are based on a single act of intercourse.

On our own motion, we sought and received supplemental briefing from the parties whether this court should consolidate White's two convictions under section 261 into a single conviction under the authority and reasoning of *Craig, supra,* 17 Cal.2d 453, and its progeny.

In *Craig, supra,* 17 Cal.2d at page 455, the defendant was convicted of both rape by force and violence and statutory rape, and was sentenced to concurrent terms on both convictions. The issue before our high court was "the propriety of entering separate judgments and sentences for both forcible and statutory rape, charged under separate counts, when but a single act of sexual intercourse has been committed." (*Ibid.*) The court in *Craig* observed: "There has been a violation of but one statute -- section 261 of the Penal Code. And, while the proof necessarily varies with respect to the several subdivisions of that section under which the charge may be brought, the sole punishable offense under any and all of them is the unlawful intercourse with the victim." (*Id.* at p. 458.)

12

On this basis, the court in *Craig* concluded, "[O]nly one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code." (*Craig, supra,* 17 Cal.2d at p. 458.) The court modified the judgment to state that the defendant had been "found guilty of the crime of Rape, a felony, as defined and proscribed in subdivisions 1 and 3 of section 261 of the Penal Code, and as charged in counts 1 and 2 of the amended information, being separate statements of the same offense . . . ." (*Craig, supra,* at p. 459.)

It appears the court in *Craig* treated the issue before it as one involving included offenses, as noted by the following language: "The authorities have set down certain rules or tests whereby it may generally be determined whether one or more offenses result from a single act or transaction. Frequently, the test is stated to be 'the *identity of the offenses* as distinguished from the identity of the transactions from which they arise. A defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their necessary elements and one is not included *within the other*.' " (*Craig, supra,* 17 Cal.2d at p. 457.)

The rule permitting multiple convictions for a single act is based on section 954, which states that " '[a]n accusatory pleading may charge . . . different statements of the same offense' " and " 'the defendant may be convicted of any number of the offenses charged.' " (See *People v. Ortega* (1998) 19 Cal.4th 686, 692.) The rule has been applied repeatedly by our Supreme Court in a variety of contexts in which defendants

13

have asserted that their convictions fall within the exception for lesser included offenses. (See e.g. *People v. Reed, supra,* (2006) 38 Cal.4th 1224, 1227 [single act of possessing firearm supports multiple firearm convictions]; *Ortega, supra,* at p. 693 [single act supports grand theft and carjacking convictions]; *People v. Pearson* (1986) 42 Cal.3d 351, 354-355 [single act supports rape and lewd conduct convictions].) In those cases the court upheld multiple convictions because each crime had a distinct element not required of the other and neither crime was the lesser included offense of the other.

Recently, a court applied *Craig, supra,* 17 Cal.2d 453, in a situation identical to the case at bar. In *People v. Smith* (2010) 191 Cal.App.4th 199, the defendant was convicted of two counts of rape -- rape of an intoxicated woman, and rape of an unconscious woman. The evidence demonstrated only one act of sexual intercourse. (*Id.* at p. 205.) Following *Craig,* the court in *Smith* concluded that the defendant could stand convicted of only a single count of rape based on the single act of intercourse. (*Smith, supra,* at p. 205.)

The respondent contends section 954 authorizes multiple convictions, subject to section 654's limitations on multiple punishment. We reject that argument.

As we have noted, section 954 allows pleading of multiple offenses, *including separate statements of the same offense*. We think the respondent's analysis is flawed at its starting point. The respondent approaches this issue from the premise that section 261, subdivisions (a)(3) and (4) are separate offenses. That major premise in wrong.

As the court noted in *Craig, supra,* 17 Cal.2d 453, section 261 creates a single crime of rape. Although the section has been amended a number of times since *Craig,*

14

the statute still defines a single crime. The section begins: "(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . "

Section 261, subdivision (a)(3) involving an intoxicated victim and subdivision (a)(4) involving an unconscious victim are simply separate ways in which the crime of rape can be committed under section 261. Section 261, subdivisions (a)(3) and (4) do not define separate crimes and do not contain separate punishments. Rather, section 264 provides the punishment for rape under section 261, without reference to the various subdivisions, which establish the circumstances in which sexual intercourse can be proved to be rape.[2]

Respondent's reliance on case law that allows conviction of multiple offenses from a single act, subject to section 654 limitations is misplaced. Those cases address different offenses, with different elements. The analysis of multiple offenses arising from the same act is not relevant to a case such as this where the statute at issue only defines one crime, regardless of the manner of its commission. In the case of truly separate offenses arising from a single act, multiple convictions are permitted, even if multiple punishments are not.

In the present case, as we have discussed, only one crime exists, based upon a single act, and that is rape as defined in section 261. The prosecution properly pled two

---

[2]     Section 264 does provide for increased punishment for forcible rape (§ 261, subd. (a)(2)) where the victim is a minor, a matter not relevant to this case.

counts of rape as *separate statements of the same offense*, but because the counts are in fact separate statements of only one offense, *Craig, supra,* 17 Cal.2d 453 holds there may only be one conviction for the single act. (*Smith, supra*, 191 Cal.App.4th at p. 205.)[3]

In sum, this case is controlled by *Craig*, *supra,* 17 Cal.2d 453, which requires that we vacate one of the rape counts, leaving a single conviction for the single act. We are aware the Supreme Court has granted review in *People v. Gonzalez* (2012) 211 Cal.App.4th 405, review granted February 27, 2013, S207830, to address the issue presented in this discussion. Pending further direction from the Court we will continue to follow the direction of *Craig* and order the two rape convictions be consolidated.

### C. Mistake of Fact

White next contends the trial court prejudicially erred when it refused to instruct the jury on mistake of fact, CALCRIM No. 3406, in connection with count 2 for rape of an unconscious person.[4] Specifically, he contends that because a key issue in this case

---

[3]    Similarly, in *People v. Ryan* (2006) 138 Cal.App.4th 360, 368, the court held the defendant could only be convicted of one count where the person had been charged with forgery by signing a false name and forgery by presenting a forged check. In *People v. Muhammed* (2007) 157 Cal.App.4th 484, 492-494, the court found a single stalking offense where the defendant had been charged with and convicted of four counts of stalking. On appeal the court vacated three of the four convictions.

[4]    CALCRIM No. 3406 provides: "The defendant is not guilty of *<insert crime[s]>* if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit *<insert crime[s]>*. [¶] If you find that the defendant believed that *<insert alleged mistaken facts>* [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for *<insert crime[s]>*. [¶] If you have a reasonable doubt about whether the defendant

16

was his mistaken belief regarding whether the victim consented to sexual intercourse, the trial court erred when it refused to give CALCRIM No. 3406. We reject this contention for two reasons.

First, the trial court had no duty to instruct on mistake of fact because that defense is not available to a charge of rape of an unconscious person. (See *People v. Dancy* (2002) 102 Cal.App.4th 21, 34-35 [§ 261, subd. (a) "describing rape of an unconscious person does not contain a lack of consent element," and thus "in the subdivision setting forth the elements of rape of an unconscious person, the Legislature obviously made an explicit choice not to require proof of lack of consent where the victim was unconscious at the time of the act of sexual intercourse."].)

Second, we note the jury found against White on the issue of whether he knew or reasonably should have known the victim was unable to resist sexual intercourse because the victim was unconscious. This finding also went to the issue of consent: if the jury believed that White did not actually know, or that a reasonable person would not have known, the victim was unable to resist the act of sexual intercourse because, for example, the victim consented to sex, as White aggressively argued at trial, then it would have acquitted him of rape. Thus, the issue of White's intent and the victim's consent was already before the jury and therefore, we conclude under any standard of review that any potential error in failing to instruct the jury with CALCRIM No. 3406 was harmless.

---

had the specific intent or mental state required for *<insert crime[s]>*, you must find (him/her) not guilty of (that crime/those crimes)."

17

(See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

### D. Juror Misconduct

White next contends the trial court erred when it denied his new trial motion based on juror misconduct.

### 1. Brief Additional Background

After the prosecution's case-in-chief, but before the defense put on its case, Juror No. 12 wrote the following note to the court:

"[The victim], perhaps the most experienced drinker in the group, yet she's incapacitated at hotel and the next day. [¶] Defendant went in cab with only [the victim], without cell phone, essentially ditched the group, and could have been alone with [the victim] in hotel room except for accidental meeting [with the rest of the group]. [¶] What's the clearance time of a date rape drug from the system? Was the drug test in April [on the victim] to pick up the presence of drug in urine sample?"

After advising counsel, the prosecutor suggested the court reread the stipulation of the parties regarding the victim's negative drug test and re-admonish the jury that it should only consider the evidence presented. Defense counsel also recommended the court admonish the jury that it was merely at the listening stage of the trial.

When the trial resumed, the court reread the stipulation about the negative drug test and both counsel reiterated their agreement to that stipulation. The court then advised the jury as follows: "The other issues that were of concern in the juror note to

18

me, which is court exhibit number 5, those are matters to be addressed in deliberations, those concerns."

After the verdict, the defense moved for a new trial based on the alleged misconduct of Juror No. 10.  Specifically, after the verdict Juror No. 5 notified the court and ultimately testified that Juror No. 10, *following the verdicts* but before oral pronouncement of the verdict, admitted to conducting research on the bar where the victim worked and reading a flattering comment potentially involving the victim.

The court in response questioned Juror No. 5 outside the presence of the remaining jurors.  Juror No. 5 noted that Juror No. 10 did not indicate one way or the other whether that research affected Juror No. 10's judgment regarding the case, nor could Juror No. 5 recall Juror No. 10 referencing that research during jury deliberations.

The court next questioned Juror No. 10.  Juror No. 10 admitted to sharing the research with the jury *after* the jury had reached a verdict, while waiting to deliver it, but told the court that research "had nothing to do with the deliberations at all.  Nothing." Juror No. 10 explained, "There wasn't any reason for it.  I just kind of looked up . . . the bar, and then was reading the reviews."  Juror No. 10 admitted that during trial she spent a few minutes looking up the bar where the victim worked, but said "that was it." Consistent with what Juror No. 5 had told the court and counsel, Juror No. 10 told the court she read a review about a "very good looking brunette bartender" who worked at the bar, but the review did not mention the bartender by name.  In response to the court's question whether the research affected her deliberations, Juror No. 10 answered, "Absolutely not."

19

Juror No. 10 further explained that when she learns of a new restaurant she looks them up "online," that her doing so was not unique to this case and after she apologized to the court and counsel, that her doing so in this case "[h]onestly . . . was the most innocent thing."

The defense subsequently filed a motion for new trial based on Juror No. 10's alleged misconduct.[5] In so doing, the defense attached reviews of the bar where the victim worked, including one that referenced the victim as being a good bartender who knew her customers' names. The defense argued Juror No. 10 was not credible concerning her motivations for looking up online the bar where the victim worked and that the compliment of the victim was inherently prejudicial.

In opposing the new trial motion, the prosecution noted the research done by Juror No. 10 was not disclosed to other jurors and was, in any event, irrelevant to the issue of guilt or innocence, particularly because there was evidence that another person with the same first name as the victim also worked at the bar. The prosecutor also noted the alleged misconduct did not compare to a juror viewing a crime scene. The trial court agreed with the prosecution and thus denied the defense's new trial motion.

---

5 The mistrial motion did not address the alleged misconduct by Juror No. 12 in connection with the jury question. Although White ostensibly forfeited this claim of alleged misconduct when he failed to object to it in the trial court (see *People v. Russell* (2010) 50 Cal.4th 1228, 1250 [noting that a claim of misconduct is forfeited "when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice"]), we nonetheless consider this issue on the merits to forestall any claim by White of ineffective assistance of counsel.

## 2. Governing Law and Analysis

Section 1181, subdivision 3, provides that the trial court may grant a new trial when "the jury has . . . 'been guilty of any misconduct by which a fair and due consideration of the case has been prevented [citation].' [¶] We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the misconduct was prejudicial." (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

Juror misconduct raises a presumption of prejudice. (*People v. Page* (2008) 44 Cal.4th 1, 59.) Unless the presumption is rebutted by the prosecution, a new trial should be granted. (*Ibid.*) As noted by one court, " '[t]his does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside.' " (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1211.)

In determining whether juror misconduct occurred we accept the trial court's credibility findings and findings of historical facts if supported by substantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.) Whether a verdict must be overturned for jury misconduct is resolved by employing the substantial likelihood test, which is an objective standard. (*In re Hamilton* (1999) 20 Cal.4th 273, 296; *People v. Marshall* (1990) 50 Cal.3d 907, 951.) " 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

21

Turning first to the question posed by Juror No. 12, we conclude there was no misconduct when that juror asked the question about the "clearance time of a date rape drug." Our high court and Courts of Appeal repeatedly have held that a trial court has the discretion to allow jurors to submit questions to be asked of witnesses, as long as certain controls are in place. (See, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 407; *People v. Cummings* (1993) 4 Cal.4th 1233, 1305; *People v. Anderson* (1990) 52 Cal.3d 453, 481; *People v. McAlister* (1985) 167 Cal.App.3d 633, 644; *People v. Gates* (1979) 97 Cal.App.3d Supp. 10, 13-15.) The court should not allow jurors to ask questions directly to witnesses (*McAlister*, *supra*, at pp. 644-645), and questions instead should be written down and submitted for consideration by the court and counsel outside the presence of the jury. (*Cummings*, *supra*, at p. 1305; *McAlister*, *supra*, at p. 644.) The questions, if appropriate, may then be asked by the court or by counsel. (*Majors*, *supra*, at p. 407; *Cummings*, *supra*, at p. 1305.)

Here, the record shows Juror No. 12 submitted a written question to the court. Outside the presence of the jury, the court then appropriately met with counsel to discuss the question. The record shows all agreed the best way to respond to the question was to reread the stipulation of the parties regarding the negative drug screen performed on the victim and to re-admonish the jury. The record shows the court did exactly that when it told the jury the parties had stipulated a urine sample from the victim was collected on February 16, 2010, a comprehensive drug screen was subsequently performed on that sample and the result of that screen was negative for all substances. We thus conclude there was no misconduct with respect to Juror No. 12.

22

However, Juror No. 10's conduct is another issue altogether. The record shows that sometime between opening and closing argument, Juror No. 10 went online and looked up the bar where the victim worked. Juror No. 10 told the court and counsel she did so for no apparent reason other than when she hears about a new place she "always" looks them up and in this instance she looked up the name of the bar where the victim worked and read a few reviews about the bar from a website. Juror No. 10 stated that she spent only a few minutes online reading about the bar, that the reviews she read in no way affected her deliberations and that she only mentioned she had done so after the jury had completed its deliberations and reached a verdict.

The People wisely concede Juror No. 10 committed misconduct by looking up the bar online, even if for just a few minutes. The issue thus becomes whether that misconduct, which we presume was prejudicial, is rebutted " 'by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 819.)

Indeed, "[w]hen juror misconduct involves the receipt of information from extraneous sources, a substantial likelihood of juror bias 'can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.]' [Citation.] . . . 'In an extraneous-information case, the "entire record" logically bearing

23

on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' " (*People v. Thomas*, *supra*, 53 Cal.4th at p. 819.)

We conclude from the entire record that there is no substantial likelihood that White suffered actual harm when Juror No. 10 went online for a few minutes and read a few reviews about the bar where the victim worked. The reviews about the bar were irrelevant to any of the issues in the case, to wit: whether the victim consented to sexual intercourse with White at the hotel, after the victim had become intoxicated while out with a group that included White.

That one of the reviews read by Juror No. 10 mentioned an attractive brunette that worked at the bar does not change our conclusion: the jury saw the victim for itself, heard her testimony and it decided whether to accept her version of what happened or White's.

In addition, the review read by Juror No. 10 regarding the atmosphere in the bar where the victim worked was already in evidence, as several witnesses testified it was a neighborhood bar where the bartenders remembers their customers' names and drink preferences. Thus, the extrajudicial information learned by Juror No. 10 in the few minutes she read reviews online about the bar (not from the bar's website) was information already before the jury.

Moreover, we reject White's contention that Juror No. 10's disregard of the court's instructions demonstrated actual bias against him. (See *People v. Nesler* (1997) 16

Cal.4th 561, 582-583 [actual bias occurs when a juror is unable to put aside his or her impressions or opinions based on extrajudicial information he or she received and render a verdict based solely on the evidence at trial].) We note from the record that the trial court, with counsel present, extensively questioned Juror No. 10 and she denied any improper motive in looking up the bar and told the court she did so out of curiosity, which is something she often did when she hears of a new restaurant or place. The court clearly found Juror No. 10 credible and believed her testimony that her actions did not in any way influence the jury's deliberations.

Thus, although Juror No. 10 engaged in misconduct, given the nature of the misconduct, the circumstances surrounding the misconduct and the issues in the case, and given the strength of the evidence against White reviewed *ante*, we independently conclude the presumption of prejudice has been rebutted because that misconduct was fleeting and was neither inherently and substantially likely to have influenced Juror No. 10 or the other members of the jury nor was Juror No. 10 actually biased against White.

### E. Denial of Probation

Lastly, White contends the trial court abused its discretion when it sentenced him to state prison for three years and denied his request for probation.

A sentencing court enjoys broad discretion in determining whether to grant or deny probation. A defendant who is denied probation bears a heavy burden to show the trial court has abused its discretion. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.) " 'In reviewing [a trial court's determination whether to grant or deny probation], it is not our function to substitute our

25

judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' " (*Ibid.*)

Here, the record shows that during the sentencing hearing the court fully considered the facts and circumstances of the case. The court heard from the victim, who made a lengthy statement asking the court to sentence White to prison for the rape that the victim claimed "forever changed [her] life." The record shows that in connection with sentencing the court also considered the sentencing statement submitted by the defense, which requested formal probation based on White's age, lack of significant criminal history and his cooperation with law enforcement for having what White called "drunk sex" with the victim; a 13-page psychological evaluation of White suggesting White was a low risk to reoffend; the probation report, which, after identifying various mitigating factors including White's lack of significant criminal history, nonetheless recommended White be sentenced to state prison for three years; and the lengthy argument of counsel.

Although there were various factors favorable to White, which the record shows the court carefully considered and which at one point appeared to sway the court to consider granting probation, in the end the record also shows the court noted this was a presumptive prison case and it found no reason to deviate from that presumption given the seriousness of the crime and the impact of that crime on the victim. On this record, we conclude the court's order denying White probation was not " 'arbitrary or

26

capricious' " or " 'exceed[ed] the bounds of reason considering all the facts and circumstances' " of the case.  (*People v. Weaver*, *supra*, 149 Cal.App.4th at p. 1311.)

## DISPOSITION

The conviction in count 2 for violation of section 261 is vacated.  In all other respects the judgment is affirmed.

_____

HUFFMAN, J.

I CONCUR:

_____

McDONALD, J.

27

Acting P. J. BENKE, concurring and dissenting.

I dissent to part B of the majority's unpublished opinion, which holds that one of the two rape convictions of defendant Billy Charles White under Penal Code section 261[1] must be vacated based on the holding of *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*).[2]

In my view, the majority's significant decision to apply *Craig* to vacate the conviction of White on count 2 for rape of an unconscious person (§ 261, subd. (a)(4)(A)) undermines almost 50 years of section 654 jurisprudence; gives defendants like White a potential "undeserved windfall" (*People v. Benson* (1998) 18 Cal.4th 24, 38-40 (dis. opn. of Chin, J.) (*Benson*), cited with approval in *People v. Correa* (2012) 54 Cal.4th 331, 338, fn. 9); and creates needless (and perhaps hopeless) confusion on the issue of the determination of whether separate criminal offenses exist when a defendant is separately charged and convicted under various provisions of a criminal statute based on conduct arising from a single act.

I note that although courts have typically applied *Craig* to sex crimes cases (see, e.g., *People v. Smith* (2010) 191 Cal.App.4th 199 [applying *Craig* to vacate a defendant's

---

[1]    All statutory references are to the Penal Code.

[2]    I also dissented to this court's recent decision of *People v. Gonzalez* (2012) 211 Cal.App.4th 405, which in my view erroneously applied *Craig* to strike one of two convictions of the defendant under different subdivisions of section 288a (e.g., oral copulation of an unconscious person [subd. (f)] and oral copulation of an intoxicated person [subd. (i)]).  Our Supreme Court on February 27, 2013 granted the petition for review of *People v. Gonzalez* (S207830).

1

conviction for rape of an unconscious person and let stand his conviction for rape of an intoxicated person]), as White recognizes in his supplemental briefing to this court, *Craig* also has been applied in other contexts, including to financial crimes. (See, e.g., *People v. Ryan* (2006) 138 Cal.App.4th 360, 368, 371 [relying in part on *Craig* and a California Supreme Court case from 1865 to hold a defendant could not be convicted of two counts of forgery for signing and then attempting to cash the same check because there was but one crime of forgery, as the "acts" enumerated in the various subdivisions of section 470 constitute but one offense of forgery].) Given the majority's view of *Craig*, unfortunately I see no limit to its application, where a defendant is charged and convicted of violating multiple provisions of a criminal statute based on the defendant's single act or uninterrupted course of conduct.

I would affirm White's conviction on count 2 for violation of section 261, subdivision (a)(4)(A) and, like the trial court below, would apply section 654, subdivision (a) to stay (and not vacate, as has the majority) that conviction.

A. *Craig*

In *Craig*, *supra*, 17 Cal.2d at page 455, the defendant was convicted of both rape by force and violence, and statutory rape. He was sentenced to concurrent terms on both convictions.[3] The issue before our high court was "the propriety of entering separate judgments and sentences for both forcible and statutory rape, charged under separate

_____

[3] Since *Craig* was decided, the Legislature has amended section 261 such that rape by force now appears in subdivision (a)(2) of section 261 and statutory rape is now defined in section 261.5.

2

counts, when but a single act of sexual intercourse has been committed." (*Ibid.*) The court in *Craig* observed: "There has been a violation of but one statute—section 261 of the Penal Code. And, while the proof necessarily varies with respect to the several subdivisions of that section under which the charge may be brought, the sole punishable offense under any and all of them is the unlawful intercourse with the victim." (*Id.* at p. 458.)

On this basis, the court in *Craig* modified the judgment to state that the defendant had been "'found guilty of the crime of *Rape*, a felony, as defined and proscribed in subdivisions 1 and 3 of section 261 of the Penal Code, and as charged in counts 1 and 2 of the amended information, being separate statements of the same offense . . . .'" (*Craig*, *supra*, 17 Cal.2d at p. 459.)

B. *Analysis*

It appears the court in *Craig* treated the issue before it as one involving included offenses, as noted by the following language from that opinion: "The authorities have set down certain rules or tests whereby it may generally be determined whether one or more offenses result from a single act or transaction. Frequently, the test is stated to be 'the *identity of the offenses* as distinguished from the identity of the transactions from which they arise. A defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two

offenses differ in their necessary elements and one is not included *within* the other.'"

(*Craig*, *supra*, 17 Cal.2d at p. 457.)[4]

As the majority recognizes (see maj. opn. *ante*, at p. 14), the rule permitting multiple convictions for a single act is based on section 954, which states that "[a]n accusatory pleading may charge . . . different statements of the same offense" and "the defendant may be convicted of any number of the offenses charged." As the majority also recognizes, courts uphold multiple convictions when "each crime had a distinct element not required of the other and neither crime was the lesser included offense of the other." (Maj. opn. *ante*, at p. 14.) I conclude this is exactly the situation in the instant case involving defendant White.

---

[4] Although rape by force and statutory rape under then-applicable section 261 were not lesser included offenses of the other, our high court's decision in *Craig* to treat the two offenses as such meant the defendant was *punished* for just one count of rape. As we discuss *post*, the result in *Craig* would have been the same if the court there had merely applied then-applicable section 654 rather than modified the dual judgments and consolidated them into a single rape conviction. (See, e.g., *People v. Kehoe* (1949) 33 Cal.2d 711, 715-716 [citing *Craig* while noting convictions of grand theft and driving an automobile without the permission of the owner are lesser included offenses of each other and thus while it "was proper to charge [defendant] with both crimes in the information and the record would support his conviction of either of them," the court erred in entering judgment on both because the conviction of the lesser included offense of driving an automobile without the permission of the owner merged into the grand theft conviction]; cf. *People v. Tideman* (1962) 57 Cal.2d 574, 585-586 (*Tideman*) [noting that the charges of abortion and murder were "obviously different offenses entailing different elements" and thus neither "was included in the charge of the other," but further concluding the defendant was properly punished only once for the crime of murder because under *Craig* and other authorities, then-applicable section 654 prohibited "'double *punishment* for the commission of a single act [citations], but it [did] not prohibit *convictions* for different offenses arising out of a single act'" (Italics added.)].)

4

Indeed, I believe the crime of rape of an intoxicated person (§ 261, subd. (a)(3)) and rape of an unconscious person (§ 261, subd. (a)(4)(A)) are separate offenses even when based on a single act of unlawful intercourse. Under section 261, subdivision (a)(3), the crime of rape occurs "[w]here a person is prevented from resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).)

However, under subdivision (a)(4) of section 261, the crime of rape occurs "[w]here a person is at the time unconscious of the nature of the act, and this is known to the accused. As used in this paragraph, 'unconscious of the nature of the act' means incapable or resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] because the victim meets one of the following conditions: [¶] (A) Was unconscious or asleep." (§ 261, subd. (a)(4).)

Here, although unlawful sexual intercourse may be committed with a person who is both unconscious and intoxicated, in the abstract it obviously is possible to commit such an act with an unconscious person who is *not* intoxicated; similarly, it is possible to commit an act of unlawful sexual intercourse with an intoxicated person who is *not* unconscious. Given these possibilities, subdivisions (a)(3) and (a)(4)(A) of section 261 are not lesser included offenses of each other. Moreover, because subdivisions (a)(3) and (a)(4)(A) of section 261 each have their "own distinct and essential elements" (see

5

*Tideman*, *supra*, 57 Cal.2d at p. 584), I conclude they are separate offenses for purposes of section 654.

I note the majority also states that subdivisions (a)(3) and (a)(4)(A) of section 261 are not separate crimes because they "do not contain separate punishments." (Maj. opn. *ante*, at p. 15.) Specifically, the majority reasons that because section 264 provides the punishment for rape under section 261 "without reference to the various subdivisions [in section 261] which establish the circumstances in which sexual intercourse can be proved to be rape" (maj. opn. *ante*, at p. 16), the various subdivisions in section 261 ipso facto cannot constitute separate offenses. I disagree.

Subdivision (a) of section 654 does not support this analysis, as it provides that an "act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." I do not read this language as requiring there to be "separate punishments" in order for there to be separate offenses under the various subdivisions of section 261 or any other similar criminal statute.

Here, the "act" for purposes of section 654, subdivision (a) was the unlawful intercourse of the victim by White. Moreover, our Legislature has determined that such an "act" is "punishable in different ways by different provisions of law," as it set forth in the various subdivisions of section 261.

6

That the punishment for rape is provided in a single statute in section 264 does not, in my view, preclude multiple rape convictions arising from a single act of, or continuous course of conduct by, a defendant, when that conduct violates multiple subdivisions of section 261. I believe the "separate punishments" form-over-substance-rule expressed by the majority in this unpublished opinion contravenes Supreme Court precedent upholding a defendant's multiple convictions arising from a single act or an uninterrupted course of conduct when each crime has its "own distinct and essential elements." (See *Tideman*, *supra*, 57 Cal.2d at p. 584).

I also believe the majority errs by failing to consider *Craig* in its historical context. In finding that each means of committing rape was *included* within the other means set forth under former section 261, the court in *Craig* was bound by the then-prevailing view of rape as a single form of "outrage" to the person and feelings of the victim and that a victim would not be "doubly outraged, once by force and once because of her tender years, but suffered only a single offense." (*People v. Mummert* (1943) 57 Cal.App.2d 849, 856–857, overruled in *People v. Collins* (1960) 54 Cal.2d 57, 60.) Society's evolving view of rape teaches that in enacting separate subdivisions in section 261, each with its own elements, the Legislature has recognized each subdivision as a separate and distinct offense.

Perhaps more importantly, I believe *Craig* should be limited to its facts based on how the defendant in that case was charged and based on the fact dual judgments were entered against him. As *Craig* notes, the information expressly pled counts 1 and 2

7

against the defendant as "'different statement[s] of the *same offense*.'" (*Craig*, *supra*, 17 Cal.2d at p. 454, italics added.) Moreover, once the defendant in *Craig* was convicted of both counts, dual judgments were entered against him on that "same offense." These unique facts help explain why the court in *Craig* consolidated the dual judgments into a single rape conviction.

In addition, after the defendant in *Craig* was convicted of both counts of rape, he was sentenced "'for the term prescribed by law,'" with the sentences to run concurrently. (*Craig*, *supra*, 17 Cal.2d at pp. 454-455.) However, in 1941 when *Craig* was decided, the State Board of Prison Terms and Paroles was responsible for fixing the definite sentence term of defendants. Thus, our Supreme Court in *Craig* was understandably concerned that the defendant would be potentially "disadvantage[d]" (*id.* at p. 459) by dual sentences, even though they ran concurrently, and thus consolidated the judgments to remove any such potential prejudice or disadvantage. (*Id.* at pp. 458-459.) Clearly, that potential "disadvantage" (e.g., dual punishment) no longer exists today because courts and not the State Board of Prison Terms and Paroles are responsible for imposing sentence and because section 654 precludes such double punishment.

Indeed, the issue addressed by *Craig* in my view is more appropriately resolved under our section 654 jurisprudence, as evidenced by a long line of cases applying that statute to multiple convictions based on a single act or an indivisible course of conduct. This view is also shared by our Supreme Court, as discussed in *In re Hess* (1955) 45 Cal.2d 171, 174 (*Hess*).

8

Briefly, *Hess* involved whether the defendant could be convicted of contributing to the delinquency of a minor when that offense was not charged in the information, after the jury acquitted the defendant of the offense of rape by force and violence under former section 261, subdivision (3).  Among other arguments, the People in *Hess* contended the defendant's conviction for contributing to the delinquency of a minor was a lesser included offense of the crime of statutory rape, and thus under *Craig*, there was "but one crime of rape, and the six subdivisions of section 261 . . . merely state six different ways of committing the same crime."  (*Hess*, *supra*, 45 Cal.2d at p. 173.)

In rejecting this argument, our high court discussed *Craig* as follows:  "In that case it was held that the defendant could not be convicted on two counts merely because he committed a forcible rape on a victim under 18 years of age.  Although it was stated in the *Craig* case that the six subdivisions of section 261 of the Penal Code 'merely define the circumstances under which an act of intercourse may be deemed an act of rape; they are not to be construed as creating several offenses of rape based upon that single act,' [citation], *that statement must be read in light of the problem then before the court, that is, whether the defendant could be doubly punished for a single act.  Under section 654 of the Penal Code it is clear that double punishment would be improper* [citations], *regardless of whether there is but one offense or six different offenses of rape.*"  (*Hess*, *supra*, 45 Cal.2d at p. 174, italics added.)  Because the defendant in *Hess* had not been charged with the offense of contributing to the delinquency of a minor and because that

9

offense was not a necessarily included offense of the crime of rape, the defendant's conviction for contributing to the delinquency of a minor was reversed. (*Id.* at p. 177.)

Justice Chin in his dissent in *Benson*, *supra*, 18 Cal.4th 24, cited with *approval* in *People v. Correa*, *supra*, 54 Cal.4th 331, 338, fn. 9, detailed the development of our state's section 654 jurisprudence and, in my view, explains *why* section 654 should apply to situations like the instant case where a defendant is charged and convicted of separate crimes—each having its "own distinct and essential elements" (see *Tideman*, *supra*, 57 Cal.2d at p. 584)—arising from a single act:

"Section 654 was enacted in 1872. Although amended as recently as 1997, it has remained unchanged in relevant respects. It currently provides, as relevant: 'An act or omission that is punishable in different ways by different provisions of law shall be punished . . . , but in no case shall the act or omission be punished under more than one provision.' The statute is silent on the procedure to follow when there are multiple convictions that may be punished but once. The courts developed that procedure.

"The question the courts faced was how to guarantee a defendant would not receive multiple punishment in violation of section 654 without giving that defendant an *undeserved windfall*. [Italics added.] Generally, the Legislature has permitted multiple *conviction* even when multiple punishment is prohibited. 'An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the

10

defendant may be convicted of any number of the offenses charged . . . .'  (§ 954.)  As we

explained in *People v. Pearson* (1986) 42 Cal.3d 351, 354 (*Pearson*), 'Section 954 sets

forth the general rule that defendants may be charged with and convicted of multiple

offenses based on a single act or an indivisible course of conduct.'  The courts had to

decide how to treat multiple convictions that could be punished but once.  Setting aside

all but one of the convictions would be unwise because, if that conviction were ever

vacated for any reason, the others would not be available to replace it.  The courts

struggled with this question in the decade of the 1960's.

"Early cases were inconsistent in their treatment of cases covered by section 654.

Some simply set aside the excess conviction.  (See *People v. McFarland* (1962) 58

Cal.2d 748, 763.)  However, as we noted in *McFarland*, 'section 654 proscribes double

punishment, not double conviction . . . .'  [Citation.]  In *McFarland*, because '[t]he

appropriate procedure . . . is to eliminate the effect of the judgment as to the lesser

offense insofar as the penalty alone is concerned,' we 'reversed [the judgment] insofar as

it imposes a sentence for grand theft, and in all other respects' affirmed.  [Citation.]  The

modern procedure of staying the impermissible punishment had not yet developed.

"That procedure was first used in *People v. Niles* (1964) 227 Cal.App.2d 749

(*Niles*).  In *Niles*, the trial court did what has become the standard; it 'stay[ed]' sentence

on the lesser offense.  The appellate court considered whether that procedure satisfied

section 654's prohibition against multiple punishment.  In a thoughtful discussion that

established the legal foundation for future section 654 jurisprudence, the court found the

11

'stay' did satisfy section 654. Citing *McFarland*, the court first noted that section 654 only proscribes multiple punishment, not multiple conviction. (*Niles*, *supra*, 227 Cal.App.2d at p. 756.) 'It is obvious,' the court stated, 'that this rule poses real problems for a trial court at the time of sentence. . . . [I]f it dismisses the count carrying the lesser penalty, and the conviction on the remaining count should be reversed on appeal, the defendant would stand with no conviction at all. . . . It follows that the procedure adopted by the trial court in this case was a reasonable—and so far as we can see the only possible—reconciliation of the various policies involved. Any other method either incurs the risk of letting a defendant escape altogether, or else imposes an unnecessary burden on an appellate court and on the trial court on the inevitable remand for correction of sentence. The procedure here affords appellant the maximum protection to which section 654 entitles him and, *under no condition*, can operate to his prejudice.' (*Ibid.*, italics added.) [¶] . . . [¶]

"More recently, in *Pearson*, we considered whether we should 'prohibit the use of more than one conviction based on each of [the] defendant's criminal acts for the purpose of enhancing any subsequent sentences he may receive.' (*Pearson*, *supra*, 42 Cal.3d at p. 358.) We noted that in *In re Wright* we 'balanced the potential windfall to the defendant of reversing multiple convictions against the prejudice to him of allowing sentencing for such convictions. We then determined that the procedure of staying execution of sentence for multiple convictions instead of reversing such convictions "reasonably reconciles the policies involved in applying section 654 to protect the rights of both the

12

state and the defendant," and follows logically from the section 654 prohibition against punishing the defendant under more than one provision based on a single criminal act. [Citation.]' [Citation.]"  (*Benson*, *supra*, 18 Cal.4th at pp. 38–40 (dis. opn. of Chin, J.).)

In *Benson*, the defendant sought to strike one of his prior convictions under the three strikes law (§§ 667, subds. (b)–(i), 1170.12) on the ground the sentence on that prior had been stayed pursuant to section 654.  In affirming the trial court's refusal to strike the qualifying strike prior, the majority in *Benson* found the statutory definition of a prior felony conviction in section 1170.12, subdivision (b) and the Legislature's purpose and objectives underlying the three strikes law established that each prior conviction of the defendant involving a serious or violent felony qualified as a separate strike, notwithstanding the fact the sentence for that conviction was stayed under section 654. (*Benson*, *supra*, 18 Cal.4th at p. 31.)  "[T]he language of section 1170.12, subdivision (b)(1), unequivocally establishes that the electorate intended to qualify as separate strikes *each* prior conviction that a defendant incurred relating to the commission of a serious or violent felony, notwithstanding the circumstances that the trial court, in the earlier proceeding, may have stayed sentence on one or more of the serious or violent felonies under compulsion of the provisions of section 654."  (*Ibid.*)

In such a case, section 654, subdivision (a) requires that a trial court limit the defendant's punishment by staying the sentence on one or more of the crimes, as was done by the trial court in the instant case when it stayed White's conviction on count 2. In contrast, if *Craig* and its progeny are followed, a defendant convicted of multiple

13

offenses arising from a single act or an indivisible course of conduct *could* receive the precise windfall our section 654 jurisprudence has, over the last 50 years, carefully avoided, if those multiple convictions are consolidated and his or her remaining conviction is subsequently overturned on appeal or by writ of habeas corpus.

For all the foregoing reasons, I conclude White was properly *convicted* in counts 1 and 2 of rape of an intoxicated person (§ 261, subd. (a)(3)) and rape of an unconscious person (*id.*, at subd. (a)(4)(A)), respectively, and further conclude the trial court properly stayed White's *punishment* in count 2 pursuant to section 654, subdivision (a).  In all other respects, I agree with the majority decision.


BENKE, Acting P. J.


14